**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT REDMON, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | Judge Castillo |
| Plaintiff, | ) ) | |
| | ) | Magistrate Judge Nolan |
| v. | ) ) | 07 C 02350 |
| UNCLE JULIO'S OF ILLINOIS, INC., D/b/a UNCLE JULIO'S HACIENDA, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff has requested that this Court enter an order determining that this action may proceed as a class action against defendant. This memorandum is submitted in support of that motion.

**I.    NATURE OF THE CASE**

The Seventh Circuit has held that cases such as the one before this Court should be resolved on a class-wide basis. It specifically found that whether a defendant violated the FCRA may be readily resolved for a class as a whole. *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 956 (7th Cir. 2006) (reversing denial of certification in a similar case) (emphasis added).

Since *GMAC Mortgage*, District Judges have followed the Seventh Circuit's holdings in numerous cases. For example, in a case with a similar fact pattern, the Court found that the class action procedure was superior to all other resolution methods, holding that

> a class action is a superior method of adjudication when "economies of time, effort, and expense" are achieved "without sacrificing procedural fairness." [*Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997).] Additionally, a class action is an appropriate and superior means of adjudication when the potential recovery on a claim is "too slight to support individual suits, but injury is substantial in the aggregate." [*GMAC Mortgage* ], 434 F.3d at 953 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344-345 (7th Cir. 1997)). Such is the case here. [*Claffey v. River Oaks Hyundai, Inc.*, 238 F.R.D. 464, 468 (N.D.Ill. 2006).]

See also, *e.g.*, *Murray v. E\*Trade Financial Corp.*, 240 F.R.D. 392 (N.D.Ill. 2006); *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387 (N.D.Ill. 2006); *Murray v. New Cingular Wireless Services, Inc.*, 232 F.R.D. 295 (N.D.Ill. 2005).

A.    *Plaintiff's Claims*

Plaintiff filed this class action under the Fair Credit Reporting Act ("FCRA") as amended by the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), contending that defendant violated a provision designed to prevent identity theft. 15 U.S.C. §1681c(g) provides that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction."

Defendant Uncle Julio's, provided non-compliant receipts to plaintiff and to at least 55,823 other customers months after §1681c(g) became effective and over three years after it was enacted. Plaintiff claims that this truncation requirement was widely publicized, that defendant's contracts contained images of what a receipt had to look like, and that defendant's non-compliance months after the effective date demonstrates that defendant willfully violated the law. Plaintiff respectfully submit that the evidence will show that defendant violated the FCRA, as amended by FACTA, willfully.

B.    *The holdings of* GMAC Mortgage *support certification*

*GMAC Mortgage* is on point supporting plaintiff's arguments that a class should be certified in this case. *GMAC Mortgage* held, in pertinent part, that:

1.    the class action procedure "was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate" [434 F. 3d at 953];

2.    statutory damages provide relief for actual losses that are small and hard to quantify, without proof of injury [*Id.*]; and

3.    an award to the class "that would be unconstitutionally excessive may be reduced.... but constitutional limits are best applied after a class has been certified [when] a judge may evaluate the defendant's overall conduct and control its total exposure" [*Id.* at 954 (citing *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003))].

These factors set forth by the Seventh Circuit clearly indicate that the matter before this Court is suitable for class certification. Proof in this case is standardized—from the receipts that were given

to plaintiffs and other customers, to the hardware and software that produced them.

## II.     STANDARD FOR CLASS CERTIFICATION

Class actions are essential to enforce laws protecting consumers.  As the Court stated in

*Eshaghi v. Hanley Dawson Cadillac Co.,* 214 Ill.App.3d 995, 574 N.E.2d 760 (1st Dist. 1991):

> In a large and impersonal society, class actions are often the last barricade of consumer protection.... To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups.  The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting.   The alternatives to the class action—private suits or governmental actions—have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly effective.  The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer. [*Id.*, 574 N.E.2d at 764, 766.]

Cases essentially the same as the present one[1], were certified as class actions in *E\*Trade*,

*River Oaks Hyundai*, *Home Loan Center*, and *New Cingular*, *supra*.

Classes have been certified in a number of other FCRA cases as well.  *Wood v. Capital One*

*Auto Finance*, 2006 U.S. Dist. LEXIS 67513 (E.D.Wis. Sept. 19, 2006). See also *In re Farmers*

*Insurance Co., Inc., FCRA Litigation,* 2006 U.S. Dist. LEXIS 27290 (W.D.Okla. Apr. 13, 2006); *In*

*re Trans Union Corp. Privacy Litigation*, 2005 U.S. Dist. LEXIS 17548 (N.D.Ill. August 17, 2005);

*Thomas v. NCO Financial Systems, Inc.*, 2004 U.S. Dist. LEXIS 5405 (E.D.Pa., March 31, 2004)

(settlement; illegal "reaging" of old debts on credit reports); *Perry v. FleetBoston Financial Corp.*,

229 F.R.D. 105 (E.D.Pa. 2005) (settlement; illegal accessing of credit reports);  *Clark v. Experian*

*Information Solutions, Inc.*, 2004 U.S. Dist. LEXIS 28324 (D.S.C., Jan. 14, 2004) (settlement,

improper reporting of debts);  *Ciccarone v. B. J. Marchese, Inc.*, 2004 U.S. Dist. LEXIS 26489

(E.D.Pa., Dec. 14, 2004), later opinion, 2004 U.S. Dist. LEXIS 25747 (E.D.Pa., Dec. 22, 2004)

(settlement; alleged unauthorized accessing of consumer reports); *Stoner v. CBA Information*

*Services,* 352 F.Supp.2d 549 (E.D.Pa. 2005) (settlement; alleged policy of refusing to investigate

consumer disputes regarding items on their credit reports); *Ashby v. Farmers Ins. Co.,*, 2004 U.S.

---

[1]  The present case involves a different section of the FCRA/FACTA, but the class issues are virtually identical.

Dist. LEXIS 21053 (D.Ore. Oct. 18, 2004) (class certified in action alleging failure to give notice of adverse action); *Braxton v. Farmer's Ins. Group,* 209 F.R.D. 654 (N.D.Ala. 2002) (similar); *White v. Imperial Adjustment Corp.*, 2002 U.S. Dist. LEXIS 26610 (E.D.La., Aug. 6, 2002), affirmed by unpublished opinion, 2003 U.S.App. LEXIS 20162 (5th Cir., Oct. 2, 2003), later opinion, 2005 U.S.Dist. LEXIS 13382 (E.D.La., June 28, 2005) (impermissible accessing of consumer reports); and *Mathews v. Government Employees Ins. Co.,* 23 F.Supp.2d 1160 (S.D.Cal. 1998) (same).

In the present case, the critical issues are (a) whether Defendant had a practice of providing customers with a sales or transaction receipt on which Defendant printed more than the last five digits of the credit card or debit card and/or the expiration date of the credit card or debit card; and (b) whether Defendant thereby willfully violated FACTA. Such claims can be resolved, in part or in whole, at summary judgment, as has been the case in actions involving the prescreening of credit information. *Murray v. IndyMac Bank, FSB*, 461 F. Supp. 2d 645 (N.D.Ill. 2006); *Murray v. Sunrise Chevrolet, Inc.*, 441 F.Supp.2d 940 (N.D.Ill. 2006). Both of these inquiries are uniform with respect to the entire class, and will be decided on facts that apply equally to all class members.

This Court has the discretion to adjust statutory damages, if necessary, to address any concerns about the size of a potential award to the class, after class certification is granted. *GMAC Mortgage* held that any limitation on supposedly excessive damages, on due process grounds, is best applied after a class has been certified . Then a judge may evaluate the defendant's overall conduct and control its total exposure. "Reducing recoveries by forcing everyone to litigate independently—so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims—has little to recommend it." *GMAC Mortgage*, 434 F.3d at 954.

Furthermore, possibility of excessive damages "might be invoked, not to prevent certification, but to nullify that effect and reduce the aggregate damage award." *Parker v. Time Warner Entertainment Co.,* 331 F.3d 13, 22, 27-28 (2d Cir. 2003); *State of Texas v. American Blast Fax, Inc.*, 164 F.Supp.2d 892 (W.D.Tex. 2001) (same).

## III.    THE PROPOSED CLASS MEETS THE CERTIFICATION REQUIREMENTS

### A.    Numerosity

Fed.R.Civ.P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "When the class is large, numbers alone are dispositive...." *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D.Ill.1986). Where the class numbers at least 40, joinder is generally considered impracticable. *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (18 sufficient); *Swanson v. American Consumer Industries,* 415 F.2d 1326, 1333 (7th Cir. 1969) (40 sufficient); *Riordan, supra*, 113 F.R.D. 60 (10-29 sufficient); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 463 (E.D.Pa. 1968) (25 sufficient); *Sala v. National R. Pass. Corp.*, 120 F.R.D. 494, 497 (E.D.Pa. 1988) (40-50 sufficient); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992) (about 70). It is not necessary that the precise number of class members be known. "A class action may proceed upon estimates as to the size of the proposed class." *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321 (E.D.N.Y. 1982); *Lewis v. Gross*, 663 F. Supp. 1164, 1169 (E.D.N.Y. 1986).

Here, the class includes at least 55, 823 customers (Motion, ¶4 and Exhibit 1). This satisfies the numerosity requirement.

### B.    Predominance of common questions of law or fact

Fed.R.Civ.P. 23(a)(2) requires that there be a common question of law *or* fact. Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members.

These requirements are normally satisfied when there is an essential common factual link between all class members and the defendant for which the law provides a remedy. *Halverson v. Convenient Food Mart, Inc.,* 69 F.R.D. 331 (N.D. Ill. 1974). Where a question of law involves "standardized conduct of the defendant toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement... is usually met." *Franklin v. City of Chicago,* 102 F.R.D. 944, 949 (N.D.Ill. 1984); *Patrykus v. Gomilla,* 121 F.R.D.

5

357, 361 (N.D.Ill. 1988). The authorities hold that cases dealing with the legality of standardized documents or conduct are generally appropriate for resolution by means of a class action because the document or conduct is the focal point of the analysis. *Halverson,* 69 F.R.D. 331; *Haroco v. American Nat'l Bank,* 121 F.R.D. 664, 669 (N.D. Ill. 1988) (improper computation of interest); *Kleiner v. First Nat'l Bank,* 97 F.R.D. 683 (N.D.Ga. 1983) (same); *Heastie v. Community Bank,* 125 F.R.D. 669 (N.D.Ill. 1989) (execution of home improvement financing documents in sequence that evaded consumers' rescission rights). This is true even though the nature and amount of damages may differ among the members of the class. *Id.*

In this case, the "common nucleus of operative fact," *Halverson,* 69 F.R.D. at 335, is that defendant provided to plaintiff and the class members noncompliant receipts. The dispositive issues— indeed, the *only* issues—are (1) whether the material provided to plaintiff complies with 15 U.S.C. §1681c(g), and (2) whether defendant violated the FCRA willfully.

The alleged failure to comply with FACTA is the same for each person who received a noncompliant receipt; thus, each class member has the same claim. *GMAC Mortgage* held that this sort question does not call for any sort of individualized inquiry. Accordingly, the questions of whether noncompliant receipts were provided and whether the FACTA violation was willful depends on facts involving defendant's activities, and not the activities of plaintiffs or class members.

The only individual issue is the identification of the consumers who were provided with a noncompliant receipt. Defendant has been asked to produce a class list through discovery requests. At any rate, identification of class members is not an obstacle to class certification. *Heastie v. Community Bank, supra*, 125 F.R.D. 669 (N.D.Ill. 1989) (court found that common issues predominated where individual questions of injury and damages could be determined by "merely comparing the contract between the consumer and the contractor with the contract between the consumer and Community Bank"); *Wilkinson v. F.B.I.*, 99 F.R.D. 148, 157 (C.D.Cal. 1983) ("a need for individual proof of damages would not preclude class certification. The amount of damages is invariably an individual question and does not defeat class treatment.'"); *Franklin,* 102 F.R.D. at 949

6

(similar).

### C. Typicality

Rule 23 requires that the claims of the named plaintiff be typical of the claims of the class:

> A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact. [*De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted).]

In the instant case, typicality is inherent in the class definition. Each of the class members has been subjected to the same illegal practice as the named plaintiff.

### D. Adequacy

The rule also requires that the named plaintiffs provide fair and adequate protection for the interests of the class. That protection involves two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992); *accord, Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 247 (3d Cir. 1975); *In re Alcoholic Beverages Litigation,* 95 F.R.D. 321.

Plaintiff understands the obligations of a class representative, and has retained experienced counsel.

Another relevant consideration under Rule 23(a)(4) is whether the interests of the named plaintiff are coincident with the general interests of the class. Here, both plaintiff and the class members seek money damages as the result of defendant' violation of the FCRA. Given the identity of claims between plaintiff and the class members, there is no potential for conflicting interests in this action. There is no antagonism between the interests of the named plaintiff and those of the class.

### E. Superiority

In *GMAC Mortgage*, the Seventh Circuit held that cases such as this one, where thousand of

people have exactly the same claim, are well-suited for class resolution:

> [Fed.R.Civ.P] 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. See, *e.g.*, *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344-345 (7th Cir. 1997). Reliance on federal law avoids the complications that can plague multi-state classes under state law, see *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 288 F.3d 1012 (7th Cir. 2002), and society may gain from the deterrent effect of financial awards. The practical alternative to class litigation is punitive damages, not a fusillade of small-stakes claims. See *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003). [*GMAC Mortgage*, 434 F.3d at 953.]

Generally speaking, efficiency is the primary focus in determining whether the class action is the superior method for resolving the controversy presented. *Eovaldi v. First Nat'l Bank,* 57 F.R.D. 545 (N.D. Ill. 1972). The Court is required to determine the best available method for resolving the controversy in keeping with judicial integrity, convenience, and economy. *Scholes*, 143 F.R.D. at 189; *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149 (W.D.Mo. 1977). It is proper for a court, in deciding the "best" available method, to consider the "....inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc., supra,* 503 F.2d 1161, 1165 (7th Cir. 1974).

In this case there is no better method available for the adjudication of the claims which might be brought by each individual consumer. The vast majority of consumers are undoubtedly unaware that their rights have been violated and their identity compromised. Furthermore, the filing of hundreds, or thousands, of FCRA suits against Defendant would be unduly burdensome to the Courts. Judicial efficiency would be greatly promoted through the adjudication of identical claims through a single proceeding.

The fact that there are large numbers of class members "is no argument at all" against certification. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660-61 (7th Cir. 2004). "The more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30.... The realistic alternative to a class action is not 17 million

individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." *Id.* *GMAC Mortgage* concurred with this view, finding that:

> reducing recoveries by forcing everyone to litigate independently—so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims—has little to recommend it. [*GMAC Mortgage*, 434 F.3d at 954.]

The special efficacy of the consumer class action has been noted by the courts and is applicable to this case. *In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 732 (N.D. Ill. 1977), held:

> a class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied . . . . (Citations omitted.)

Furthermore, *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 628-629 (E.D.Pa 1994) held:

> given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action. As Professors Wright, Miller and Kane have discussed, in analyzing consumer protection class actions such as the instant one, 'typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis. These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly situated.' 7B Wright et al., §1778, at 59; see *e.g.*, *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) ('Class actions . . . may permit the plaintiff to pool claims which would be uneconomical to litigate individually.') The public interest in seeing that the rights of consumers are vindicated favors the disposition of the instant claims in a class action form.

> Class certification will provide an efficient and appropriate resolution of the controversy.

*Zanni v. Lippold,* 119 F.R.D. 32, 35 (C.D.Ill. 1988).

## IV.    CONCLUSION

The proposed class meets the requirements of Rules 23(a) and 23(b)(3). Plaintiff respectfully requests that this Court certify a class as set forth above.

Respectfully submitted,


/s/Keith J. Keogh

Keith J. Keogh
Alexander H. Burke
LAW OFFICES OF KEITH J. KEOGH, LTD.
227 W. Monroe Street, Suite 2000
Chicago, IL 60606
(312) 726-1092
(312) 726-1093 (fax)

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ROBERT REDMON, Individually <br> and on behalf of all others similarly situated, | ) <br> ) |
| | )    1:07-cv-02350 |
| Plaintiff, | ) |
| | )    Judge Castillo |
| v. | ) |
| | ) |
| UNCLE JULIO'S OF ILLINOIS, INC. d/b/a <br> UNCLE JULIO'S HACIENDA, | )    Magistrate Judge Nolan <br> ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR DISCOVERY

To:  Robert Redmon, by and through his attorney of record, Keith J. Keogh, Law Offices of Keith J. Keogh, Ltd., 227 Monroe St., Suite 2000, Chicago, IL 60606.

Pursuant to FEDERAL RULES OF CIVIL PROCEDURE 33, 34, and 36, Defendant Uncle

Julio's of Illinois, Inc. d/b/a Uncle Julio's Hacienda ("Uncle Julio's" or "Defendant") serves

these Answers and Objections to Plaintiff's First Request for Discovery as follows:

### General Objections

Uncle Julio's makes the following objections at the outset so as not to require repetition in

each request. Each response herein is made subject to and incorporates the following objections

(the "General Objections"):

1.      Uncle Julio's has not completed its investigation or discovery relating to this case

and has not completed its preparation for trial. The following responses are based on, and

therefore limited by, the records and information still in existence, presently recollected, and thus

far discovered in the course of preparing these responses. Uncle Julio's has the right to further

investigation and discovery and Uncle Julio's, thus, reserves the right to supplement or amend its responses hereafter and at trial based on subsequently discovered information.

2. Uncle Julio's submits its responses based upon information and/or documentation presently available to and located by Uncle Julio's, subject to its objections stated herein. Uncle Julio's' responses represent its good faith effort to answer the requests propounded by Plaintiff. Uncle Julio's is conducting a continuing search for responsive information, and subject to the objections specified below, Uncle Julio's will provide its responses to the requests based on its present knowledge. Uncle Julio's reserves the right to amend, add to, delete from, or in any manner modify its responses once it has completed its discovery and investigative efforts and has ascertained all relevant facts. Uncle Julio's further reserves the right to refer to, conduct discovery with reference to, or offer into evidence at trial all such other witnesses, facts and evidence, notwithstanding the absence of reference to such witness, facts or evidence in these responses to the requests.

3. Uncle Julio's has made a reasonable effort to respond to each request as it understands and interprets the request. If Plaintiff subsequently asserts a different interpretation, Uncle Julio's reserves the right to supplement its responses and/or objections.

4. To the extent that any request may be construed as calling for information which is subject to a claim of privilege, including, without limitation, the attorney-client privilege, work-product doctrine or joint defense privilege, Uncle Julio's hereby claims such privilege and objects to such request on that basis.

5. Uncle Julio's objects to these requests to the extent they incorrectly assume the truth of facts not proven or facts not in evidence.

6.     To the extent that any request may utilize terms and phrases which are not defined in the requests and those terms and phrases are subject to numerous and disparate interpretations and meanings, Uncle Julio's objects.

7.     Uncle Julio's objects to the extent the Definitions seek to impose duties or obligations beyond those required by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, statute or common law.

## REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Defendant's records indicate that plaintiff, Robert Redmon, is a resident of this district.

### RESPONSE:

Uncle Julio's has insufficient information, after reasonable inquiry, to admit or deny this request.

### REQUEST FOR ADMISSION NO. 2:

On April 20, 2007, Uncle Julio's location at 855 W. North Ave., Chicago, Illinois presented plaintiff with a computer-generated cash register receipt which displayed his card expiration date.

### RESPONSE:

Admitted.

### REQUEST FOR ADMISSION NO. 3:

Exhibit A is a copy of the receipt provided to plaintiff on April 20, 2007.

### RESPONSE:

Admitted.

## REQUEST FOR ADMISSION NO. 4:

On December 4, 2006, defendant knew that FACTA required it to truncate certain portions of credit card and debit card receipts.

## RESPONSE:

Defendant objects to this request on the grounds that it purports to require a legal conclusion. Subject to the foregoing general and specific objections, Defendant admits that it was aware that FACTA prohibits displaying more than the last five digits of a credit or debit card on a printed receipt. Beyond the foregoing, denied.

## REQUEST FOR ADMISSION NO. 5:

There are over 1,000 persons to whom an Uncle Julio's in Illinois provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit or debit card number, and/or (b) the expiration date of the person's credit card or debit card.

## RESPONSE:

Defendant admits that more than 1,000 persons received a receipt that included the expiration date of their credit or debit card. Beyond the foregoing, denied.

## REQUEST FOR ADMISSION NO. 6:

There are over 500 persons to whom an Uncle Julio's in Illinois provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit or debit card number, and/or (b) the expiration date of the person's credit card or debit card.

## RESPONSE:

Defendant objects to this request on the ground that it apparently seeks the same information as Request for Admission No. 5 and is thus duplicative. Subject to the foregoing objections, Defendant admits that more than 500 persons received a receipt that included the expiration date of their credit or debit card. Defendant denies the remaining allegations.

## REQUEST FOR ADMISSION NO. 7:

On April 20, 2007, it was defendant's custom and policy to provide customers who purchased items a receipt with their credit or debt card expiration date printed on it.

## RESPONSE:

Defendant objects to the request because the phrase "custom and policy" is undefined and vague. Defendant further objects to this request to the extent Plaintiff requests Defendant to admit that it intended to violate FACTA. Beyond the foregoing, Defendant admits that, on April 20, 2007, its credit card terminal printed receipts with the credit card expiration dates displayed on them.

## REQUEST FOR ADMISSION NO. 8:

On December 4, 2006, defendant knew that providing credit card and/or debit card receipts with expiration dates printed on them was prohibited by FACTA and the FCRA.

## RESPONSE:

Defendant objects to this request on the ground that it purports to require a legal conclusion. Subject to the foregoing general and specific objections, denied.

## REQUEST FOR ADMISSION NO. 9:

Defendant received at least one communication from a credit card company advising it to comply with FACTA's credit card truncation requirements before December 4, 2006.

## RESPONSE:

Denied.

## REQUEST FOR ADMISSION NO. 10:

Defendant intended to violate the FACTA and the FCRA with respect to plaintiff and all other Illinois cardholders when it provided them an electronically printed email receipt after December 4, 2006, which receipt displayed either (a) more than the last five digits of the person credit or debit card number, and/or (b) the expiration date of the person's credit card or debit card.

## RESPONSE:

Defendant objects to this request on the ground that it purports to require a legal conclusion. Subject to the foregoing general and specific objections, denied.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Explain with specificity what steps, if any, defendant has ever taken in order to comply with the FACTA amendment to the FCRA as it relates to truncation of credit card information on receipts.

### ANSWER:

Defendant objects to the term "steps" to the extent that it seeks to impose a greater obligation than that imposed under the applicable law or contracts. Defendant further objects to the extent that this interrogatory suggests that Defendant knew or had knowledge of the requirements of FACTA. Subject to the foregoing general and specific objections, Defendant states that in May 2003 it upgraded its Point of Sale software to mask all but the last 4 digits of credit or debit card numbers. Defendant learned of FACTA's prohibition on printing expiration dates at the time Plaintiff filed this lawsuit. After the lawsuit was filed, Defendant instituted a policy to manually mask expiration dates that were printed on receipts, until it could upgrade its software to mask expiration dates.

### INTERROGATORY NO. 2:

Identify all departments, and all employees within those departments, that had any involvement in complying, ensuring compliance or attempting to ensure compliance with the FACTA amendment to the FCRA.

### ANSWER:

Defendant objects that this interrogatory is overly broad and that the phrase "had any involvement" is vague. Subject to the foregoing general and specific objections, Defendant identifies the following:

Todd Conger
President, Chief Operating Officer
1101 North Union Bower
Suite 160
Irving, TX 75061

Information Technology Department - Charles Banks, Paul Davis, Richard Davis
1101 North Union Bower
Suite 160
Irving, TX 75061

## INTERROGATORY NO. 3:

Identify all third parties, agents or other entities that had anything to do with defendant's compliance or noncompliance with the FACTA amendment to the FCRA.

## ANSWER:

Defendant objects that the interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure. Defendant objects that the phrase "has anything to do with defendant's compliance or noncompliance" is vague, ambiguous, and overly broad. Defendant further objects that this interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this lawsuit. Subject to and without waiving the foregoing general and specific objections,

Texas Cash Register
11332 Mathis Ave
Dallas, TX 75229
972-910-9880
Tammy Harbin – Uncle Julio's Account Representative

Uncle Julio's purchased its POS software from Texas Cash Register.

Radiant Systems

Radiant Systems manufactures Aloha, which is the name of the POS software that Uncle Julio's uses, and distributes its software to Texas Cash Register.

## INTERROGATORY NO. 4:

Provide the number and identities of all persons to whom defendant provided an electronically printed receipt at the point of sale of sale or transaction, in a transaction occurring in an Illinois store occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit or debit card number, and/or (b) the expiration date of the person's credit card or debit card.

## ANSWER:

Defendant objects that the phrase "an Illinois store" is vague as Defendant operates two stores in Illinois, and Plaintiff was only a customer at one of them. To the extent that Plaintiff requests information regarding a store of which he was not a customer, Defendant objects that this interrogatory is overly broad. Furthermore, Defendant objects to this interrogatory on the grounds that it is overly broad since the interrogatory seeks information unrelated to the named Plaintiff, on the grounds that it seeks information not relevant to lead to the discovery of admissible evidence, on the grounds that class-wide discovery is inappropriate at this stage of the litigation, and on the grounds that it seeks information that violates Defendant's customers' right to privacy as well as the terms of Defendant's agreements with VISA, MASTERCARD,

AMERICAN EXPRESS, and DISCOVER. Subject to and without waiving the foregoing general and specific objections, Defendant states that it provided electronically printed receipts to 55,823 customers at its store located at 855 W. North Ave., Chicago, Illinois.

## INTERROGATORY NO. 5:

Provide the number and identities of all Illinois residents to whom Defendant provided an electronically printed receipt at the point of sale or transaction, in a transaction in an Illinois store occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit or debit card number, and/or (b) the expiration date of the person's credit card or debit card.

## ANSWER:

Defendant objects that the phrase "an Illinois store" is vague as Defendant operates two stores in Illinois, and Plaintiff was only a customer at one of them. To the extent that Plaintiff requests information regarding a store of which he was not a customer, Defendant objects that this interrogatory is overly broad. Furthermore, Defendant objects to this interrogatory on the grounds that it is overly broad since the interrogatory seeks information unrelated to the named Plaintiff, it seeks information not relevant to lead to the discovery of admissible evidence, class-wide discovery is inappropriate at this stage of the litigation, and it seeks information that violates Defendant's customers' right to privacy as well as the terms of Defendant's agreements with VISA, MASTERCARD, AMERICAN EXPRESS, and DISCOVER. Subject to and without waiving the foregoing general and specific objections, Defendant states that it provided electronically printed receipts to 55,823 customers at its store located at 855 W. North Ave., Chicago, Illinois but has insufficient information to determine the residences of its customers.

## INTERROGATORY NO. 6:

Explain why defendant printed the expiration date on receipts it provided to plaintiff and the proposed class, and identify specifically any documents that support this explanation.

## ANSWER:

Defendant objects to this interrogatory on the ground that it improperly requests Defendant to marshall its evidence as to an element for which the Plaintiff has the burden of proof. Subject to the foregoing general and specific objections, Defendant states that it was not aware and had no knowledge as to FACTA's prohibition against printing the expiration date on the receipt it provided to plaintiff.

## INTERROGATORY NO. 7:

State how and when you first learned of FACTA's truncation requirements, and identify what steps and/or procedures you or your agents have ever taken in order to prevent credit card expiration dates or more than five digits of the card number from being printed on receipts. Include the date the step was taken, the person(s) who decided to take the step, the person(s) who performed the step and how the step altered defendant's practices.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR DISCOVERY                          Page 8

**ANSWER:**

Defendant objects to this interrogatory to the extent it apparently requests the same information as Interrogatory No. 1 and is thus duplicative. Subject to the foregoing general and specific objections, in May 2003 Defendant's former CEO directed Uncle Julio's IT department to mask all but the last 4 digits of credit card numbers. In May 2003, Defendant upgraded its Point of Sale software to mask all but the last four digits of credit or debit card numbers. Defendant learned of FACTA's prohibition on printing expiration dates at the time Plaintiff filed this lawsuit. After the lawsuit was filed, Defendant instituted a policy to manually mask expiration dates that were printed on receipts, until it could upgrade its software to mask expiration dates.

**INTERROGATORY NO. 8:**

Identify all third parties and/or vendors that have been involved in providing receipts to customers since January 1, 2000.

**ANSWER:**

Defendant objects on the ground that this interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure. Defendant objects that this interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this lawsuit. Defendant objects that the phrase "been involved in providing receipts" is vague, ambiguous, and overly broad. Subject to and without waiving the foregoing general and specific objections,

'    Texas Cash Register
     11332 Mathis Ave
     Dallas, TX 75229
     972-910-9880
     Tammy Harbin – Uncle Julio's Account Representative

Uncle Julio's purchased its POS software from Texas Cash Register.

**INTERROGATORY NO. 9:**

Identify all third parties and/or vendors that have been involved in processing credit card transactions for Illinois customers since January 1, 2000.

**ANSWER:**

Defendant objects on the ground that this interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure. Defendant objects that this interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this lawsuit. Defendant objects that the phrase "been involved in" is vague, ambiguous, and overly broad. Subject to and without waiving the foregoing general and specific objections,

Chase Bank
Darlene Schmidt
800-326-7907 ext. 5427
DSchmidt@chasemerchantservices.com

Chase Bank is the processor of Uncle Julio's credit cards.

**INTERROGATORY NO. 10:**

State whether you received advertising referring to (a) truncation of credit card numbers or expiration dates or (b) the ability of hardware or software to print receipts that did not display expiration dates or portions of credit card numbers.

**ANSWER:**

Defendant objects that this interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this lawsuit. Defendant objects that this interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure. Subject to and without waiving the foregoing general and specific objections, after a diligent review, Defendant is unable to confirm that it received advertisements that are responsive to this interrogatory. Therefore, Defendant denies receiving any such advertisements.

**INTERROGATORY NO. 11:**

Identify all persons who were involved in making the decision not to truncate credit card expiration dates on receipts provided to defendant's customers.

**ANSWER:**

Defendant objects on the basis that this interrogatory assumes the truth of facts not proven or facts not in evidence. Specifically, the interrogatory assumes that Defendant made a conscious decision not to truncate credit card expiration dates. Defendant has already stated that it was not aware and had no knowledge of the truncation requirements as to expiration dates on credit/debit cards. Consequently, it did not make a decision not to truncate credit card expiration dates. Therefore, Defendant is unable to identify any such individual.

## INTERROGATORY NO. 12:

Identify all persons (including agents and third parties) involved in deciding what remedial measures to take in response to this lawsuit or other similar lawsuits, what measures were taken, who implemented the remedial measures and when they were implemented.

## ANSWER:

Defendant objects to this interrogatory to the extent that it requests information that is subject to the attorney-client and work-product privileges. Defendant objects that this interrogatory is overly broad, exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure, and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this lawsuit. Defendant objects that the phrase "remedial measures" is vague and ambiguous. To the extent that this interrogatory is duplicative of Interrogatory Nos. 1 and 7, Defendant objects. Subject to the foregoing general and specific objections, Defendant states that after Plaintiff filed this lawsuit, Todd Conger directed all employees of Uncle Julio's to manually mask expiration dates that were printed on receipts, until Defendant could upgrade its software to mask expiration dates.

## INTERROGATORY NO. 13:

State the net income of defendant for 2004, 2005 and 2006.

## ANSWER:

The interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure. Defendant objects that this interrogatory is overly broad, of no probative value, and seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 14:

Please identify the person(s), by name, address and telephone number, responding to these requests, each person consulted in preparing the responses, the interrogatory answer(s) they were consulted about, and identify each document consulted or referred to by that person.

## ANSWER:

Defendant objects that this interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure and seeks information that violates the attorney-client and work product privileges. Subject to the foregoing general and specific objections,

Nancy West
Executive Assistant
1101 North Union Bower
Suite 160
Irving, TX 75061

Charles Banks
Director of Information Technology
1101 North Union Bower
Suite 160
Irving, TX 75061

Paul Davis
Information Technology
1101 North Union Bower
Suite 160
Irving, TX 75061

Richard Liverett
Senior Accountant
1101 North Union Bower
Suite 160
Irving, TX 75061

Lisa Banks
Director of Accounting
1101 North Union Bower
Suite 160
Irving, TX 75061

## INTERROGATORY NO. 15:

State whether there is any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of an award, judgment or settlement in this action or to indemnify or reimburse for payments made to satisfy any award, judgment or settlement which may be entered in this action. Also, identify all documents reflecting the existence of such an insurance or indemnification agreement.

## ANSWER:

None.

## INTERROGATORY NO. 16:

List all possible sources from which defendant may be able to compile a list of the persons to whom it provided an electronically printed receipt at the point of sale of sale or transaction, in a transaction in an Illinois store occurring after December 4, 2006, which receipt displays either (a) more than the last five digits of the person credit or debit card number, and/or (b) the expiration date of the person's credit card or debit card.

**ANSWER:**

The interrogatory exceeds the scope of permissible discovery under the Federal Rules of Civil Procedure. Defendant objects that this interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence in this lawsuit. Defendant also objects that the phrase "possible sources" is undefined, vague, ambiguous, and overly broad. Defendant objects that this interrogatory seeks information that is related to individuals other than the named Plaintiff, and that class-wide discovery is inappropriate at this stage of the litigation.

**INTERROGATORY NO. 17:**

Identify any documents or other things that are responsive to plaintiff's "Rule 34 Requests" below, that are not being produced. Explain the substance, creation date, whereabouts, and request to which they are responsive and of each of those things, and explain defendant's reason(s) for not producing them.

**ANSWER:**

Defendant directs Plaintiff to its response to Request for Production No. 21 below.

**INTERROGATORY NO. 18:**

Identify all claims and complaints (including pleadings and correspondence) you have received alleging noncompliance with FACTA, including but not limited to 15 U.S.C. § 1681c(g).

**ANSWER:**

Defendant objects to this interrogatory on the ground that it is overly broad and not calculated to lead to the discovery of admissible evidence. Specifically, the interrogatory seeks information related to individuals other than the named Plaintiff. Subject to the foregoing general and specific objections, Defendant states that this lawsuit is the only complaint against Defendant alleging non-compliance with FACTA.

**RULE 34 REQUESTS**

**REQUEST NO. 1:**

All records, data, documents or other things that refer to plaintiff, or any index, credit card or other account number or designation assigned to plaintiff.

JUL-11-2007  09:19        GARDERE                                                         P.17

**RESPONSE:**

Defendant objects to the extent that the request seeks documents protected by the attorney-client and work-product privileges. Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

**REQUEST NO. 2:**

All documents concerning defendant's compliance with FACTA, including 15 U.S.C. §1681c(g).

**RESPONSE:**

Defendant objects to the extent that the request seeks documents protected by the attorney-client and work-product privileges. Subject to and without waiving the foregoing general and specific objections, Defendant will produce responsive documents, to the extent they exist.

**REQUEST NO. 3:**

All emails, memoranda or other electronically searchable materials on servers or in archived files, including documents sent to or from any employee or agent of defendant (including attorneys acting within the scope of their representation of defendant), created, sent, modified or distributed on or after January 1, 2004, that contain any of the following strings of characters and/or satisfies the following search criteria:

    (a)    "FACTA", within the same email or email string as "1681c", and/or "1681(c)"

    (b)    "FCRA" within the same email or email string as "1681c", and/or "1681(c)"

    (c)    "truncate" within the same email or email string as "card number"

    (d)    "expiration date" within the same email or email string as "block", "truncate", "delete" or "exclude"

    (e)    "receipt" within the same email or email string as "point of the sale"

    (f)    "shall print more than the last 5 digits" within the same email or email string as "receipt"

The search shall be performed regardless of whether a term is preceded or followed by a space or another character, so that a search for "truncate" will turn up "truncated", "untruncated" and "truncated".

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR DISCOVERY**                          Page 14

### RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

### REQUEST NO. 4:

All written policies and other documents concerning defendant's compliance or noncompliance with the FCRA, including but not limited to the violations alleged in this lawsuit.

### RESPONSE:

Defendant objects to the extent that the request seeks documents protected by the attorney-client and work-product privileges. Subject to and without waiving the foregoing general and specific objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

### REQUEST NO. 5:

All documents that concern or discuss truncation of any portion of credit and/or debt card numbers.

### RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

### REQUEST NO. 6:

All documents that concern or discuss truncation of any portion of credit and/or debt card expiration dates.

### RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

### REQUEST NO. 7:

All documents concerning defendant's document destruction policy as it pertains to any materials requested in these discovery requests.

### RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

## REQUEST NO. 8:

All documents that demonstrate or tend to show that inclusion of expiration dates as complained of in this lawsuit was the result of any error.

## RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

## REQUEST NO. 9:

All memoranda, written policies, practices or manuals or other documents that discuss safeguarding defendant's customers' privacy or identify theft.

## RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

## REQUEST NO. 10:

All memoranda, written policies, practices or manuals or other documents (including legal memoranda, communications and other documents) that discuss avoiding liability under FACTA and/or the FCRA.

## RESPONSE:

Defendant objects that to this request to the extent it seeks documents protected by the attorney-client and work-product privileges. Subject to and without waiving the foregoing general and specific objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

## REQUEST NO. 11:

A copy of the complaint and the initial communication for all lawsuits, BBB complaints, or attorney general or FTC communications or complaints regarding defendant's compliance or noncompliance with FACTA and/or the FCRA since January 1, 2002.

## RESPONSE:

Defendant objects that the request is overly broad, beyond the scope of permissible discovery under the Federal Rules of Civil Procedure, seeks information related to individuals other than the named Plaintiff, is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing general and specific objections, after a diligent search, Defendant does not possess documents responsive to the request.

## REQUEST NO. 12:

All communications between defendant, or defendant's attorneys, and any third party regarding plaintiff, this lawsuit or compliance with 15 U.S.C. § 1681c(g).

## RESPONSE:

Defendant objects to the extent that the request seeks documents protected by the attorney-client, work-product, and joint defense privileges. Subject to and without waiving the foregoing general and specific objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

## REQUEST NO. 13:

A copy of any communication, including advertisements, received from any third party from, including but not limited to: credit card companies, credit card machine vendors or merchants or banks, regarding truncation of credit card information on receipts or FACTA.

## RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant will produce responsive documents, to the extent they exist.

## REQUEST NO. 14:

A copy of the user manuals for every credit card terminal that processed credit card transactions in Illinois from January 1, 2000.

## RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

## REQUEST NO. 15:

Federal tax returns for defendant for 2004, 2005 and 2006.

**RESPONSE:**

Defendant objects that the request is beyond the scope of permissible discovery under the Federal Rules of Civil Procedure. Defendant also objects on the grounds that the request is overly broad and seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 16:**

A copy of any insurance agreement that may require any third party to help satisfy all or part of any judgment, award or settlement of this case, to or pay for any part of the defense costs or fees or indemnification.

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Defendant does not possess documents responsive to the request.

**REQUEST NO. 17:**

All communications to or from Ambiron TrustWave that mention truncation of information on receipts, FACTA and/or 15 U.S.C. § 1681c(g).

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

**REQUEST NO. 18:**

All communications to or from ATW Corp. that mention truncation of information on receipts, FACTA and/or 15 U.S.C. § 1681c(g).

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

**REQUEST NO. 19:**

All contracts and agreements for hardware or software used to process credit or debit card transactions or issue receipts in such transactions.

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

## REQUEST NO. 20:

All documents relating to Payment Application Best Practices.

## RESPONSE:

Subject to and without waiving the foregoing general objections, Defendant states that after a diligent search, it does not possess documents responsive to the request.

## REQUEST NO. 21:

A copy of every record or document that is within defendant's custody and/or control that may assist development of a list of Illinois persons who were provided with receipts that contain their credit card expiration date.

## RESPONSE:

Defendant objects to this interrogatory on the ground that it is overly broad since it seeks information unrelated to the named Plaintiff, it seeks information not calculated to lead to the discovery of admissible evidence, class-wide discovery is inappropriate at this stage of the litigation, and it purports to require Defendant to disclose personal information in violation of its agreements with VISA, MASTERCARD, AMERICAN EXPRESS, and DISCOVER. Defendant further objects to this request on the grounds that it purports to require Defendant to violate the confidentiality and privacy rights of its customers. Defendant further objects that this request is harassing and unduly burdensome.

•

| COUNTY OF DALLAS | § |
| STATE OF TEXAS | § § |

### VERIFICATION

I, Todd Conger, being first duly sworn on oath, depose and state as follows:

I am the President and Chief Operating Officer for Uncle Julio's Corporation, the parent organization of Uncle Julio's of Illinois d/b/a Uncle Julio's Hacienda. I am authorized to execute this verification on behalf of Uncle Julio's of Illinois d/b/a Uncle Julio's Hacienda. I have reviewed the foregoing Answers to Plaintiff's Interrogatories, which have been prepared with the assistance of counsel, and state that the facts contained therein are true and correct to the best of my information and belief.

_____
Todd Conger

'Subscribed and sworn to before me, this __10__ day of July, 2007, to certify which witness my hand and seal of office.



NANCY C WEST
NOTARY PUBLIC
State of Texas
Comm. Exp. 09-06-2010

_____
Notary Public in and for the
State of Texas
My Commission Expires: __9-6-2010__

Date:  July 11, 2007                    Respectfully submitted,

                                         UNCLE JULIO'S OF ILLINOIS, INC. d/b/a
                                         UNCLE JULIO'S HACIENDA

                                         _Randall A. Hack_
                                         Brian I. Hays
                                         LORD BISSELL & BROOK
                                         111 South Wacker Drive
                                         Chicago, IL 60606
                                         312/443/0676
                                         Fax: 312/896-6676

                                         *Of Counsel:*
                                         Mark W. Bayer
                                         Texas State Bar No. 01939925
                                         Kaylee D. Higginbotham
                                         Texas State Bar No. 24037952
                                         GARDERE WYNNE SEWELL LLP
                                         3000 Thanksgiving Tower
                                         1601 Elm Street
                                         Dallas, Texas 75201-4761
                                         214/999-3000
                                         Fax: 214/999-4667

## CERTIFICATE OF SERVICE

I hereby certify that on July 11th, 2007 a true and correct copy of the foregoing

Defendant's Response to Plaintiff's First Request for Discovery was served by electronic filing

on the following:

Keith J. Keogh
Alexander H. Burke
LAW OFFICES OF KEITH J. KEOGH, LTD.
227 W. Monroe St., Suite 2000
Chicago, Illinois 60606

Kaylee D. Higginbotham

# EXHIBIT 2

Back to Story | Print 🖨 | Close ☒



U.S. SENATE COMMITTEE ON

# Commerce, Science, and Transportation

DANIEL INOUYE, Chairman                    TED STEVENS, Vice Chairman

**For Immediate Release**
**April 25th, 2007**

### STEVENS AND INOUYE ID THEFT PREVENTION ACT PASSES COMMERCE COMMITTEE

WASHINGTON, D.C. – The Senate Committee on Commerce, Science and Transportation today passed S. 1178 the "Identity Theft Prevention Act." Committee Vice Chairman Senator Ted Stevens (R-Alaska) and Commerce Committee Chairman Daniel Inouye (D-Hawaii) introduced the legislation and it is cosponsored by Senator Gordon Smith (R-Ore.) and Senator Mark Pryor (D-Ark.) and Senator Bill Nelson (D-FL). This bill would strengthen information safeguards and ensure notification to consumers whose sensitive personal information has been acquired without authorization. The bill would also direct the Federal Trade Commission (FTC) to enforce rules to protect such information. Under the bill, consumers would be able to freeze their credit for a reasonable fee to protect themselves from identity theft. The bill now moves to the Senate where it awaits consideration.

**"ID theft is a growing problem that plagues Americans in the far reaches of our nation and everywhere in between," said Senator Stevens. "Studies of identity theft show that Alaskans are particularly susceptible to this criminal activity. It is time for Congress to act. We must take steps to help people protect themselves. I urge the Senate to take up this bill, which has received broad bipartisan support, and pass it quickly."**

Identity theft has risen dramatically nationwide over the past decade and the FTC estimates that each year nearly 9 million Americans – or roughly 4.6 percent of the domestic adult population – are victimized by identity thieves. The FTC indicates that physical and online identity theft accounted for 40 percent of the more than 616,000 consumer fraud complaints filed last year with the agency. The costs associated with identity theft are enormous. In 2006, it is estimated that the losses to businesses and financial institutions due to identity theft totaled $52.6 billion, and the out-of-pocket losses to consumers totaled $5 billion, which does not take into account the average 300 hours spent by each victim to restore their good name.

# EXHIBIT 3



**NEXT OPRAH:**

Mary Winkler: The Wife Who Killed Her Pastor Husband

post-gazette**NOW**
*Pittsburgh Post-Gazette*

Living

# Identity theft -- unplugged

Monday, October 10, 2005
By Robin Sidel, The Wall Street Journal

Worried that shadowy gangs of Russian hackers are breaking into computer networks, stealing your financial secrets? Don't lose too much sleep over it.

But you might want to hide your checkbook when friends and relatives come visit your home.

Despite a series of alarming reports in recent months about security breaches that have made personal data potentially vulnerable to crooks -- such as the one at credit-card processor CardSystems Solutions Inc. affecting 40 million credit-card accounts -- most bank-related crimes remain stubbornly low-tech. They range from simple forgery of a check, to unauthorized credit-card use, to Dumpster-diving, which is when someone plucks a bank statement or credit-card bill from your garbage.

And the perpetrator probably may not be a stranger.

According to one recent study, by Javelin Strategy &amp; Research, a consulting firm in Pleasanton, Calif., in 26 percent of all cases the fraud victims knew the person who had misused their personal information. (Typically it was a family member, friend or neighbor, or in-home employee.) In addition, as much as 50 percent of debit-card fraud occurs when a card is snagged by a family member or friend who knows the card's personal-identification number, according to a recent report from TowerGroup, a unit of MasterCard International Inc.

The term "identity theft" is often used loosely to describe a wide array of crimes. But true identity theft occurs when someone uses stolen information to create a new form of identity, such as opening a new credit-card account under the victim's name. That differs significantly from other kinds of bank fraud, such as when a criminal uses a stolen ATM card to get cash out of a teller machine.

Whether it's full-blown ID theft or small-scale fraud, even in cases where the criminal is a stranger, it's almost never a case of sophisticated computer hacking. Although 75 percent of all households use the Internet and 65 percent of those do some online banking, "most criminals obtain personal information through traditional rather than electronic channels," according to the Javelin study. Some 29 percent of victims surveyed said their personal

information was obtained through a lost or stolen wallet, checkbook or credit card.

According to the study, the bulk of the rest were attributed to friends and relatives, corrupt employees, stolen mail, Dumpster-diving, and computer spyware. Computer viruses or hackers accounted for only 2.2 percent of incidents. While there has been a significant increase in the number of electronic attempts at identity theft, "the ones that are working are the traditional ones," said James Van Dyke, Javelin's president.

The Federal Trade Commission itself defines identity theft broadly, describing it as when someone possesses or uses a person's personal or financial information without their knowledge with the intent of committing fraud or other crimes.

The commission estimates that identity theft affects nearly 5 percent of the adult population, costing businesses and individuals a combined $53 billion annually. It received 246,000 reports of identity theft last year, nearly triple the number received in 2001. The FTC has attributed much of that rise to heightened awareness of the issue among consumers, making them more likely to report incidents as identity theft.

Overall, statistics on identity theft are spotty. For one thing, research has found that most victims of identity theft don't report the crime to police. In many cases, they aren't even certain that they are truly crime victims and don't know how the incident occurred. Banks increasingly alert authorities when incidents occur, but even those disclosures can be incomplete.

There are a number of steps individuals can take to protect themselves.

Many financial institutions are increasingly urging their clients to start using paper shredders at home. Household models can be relatively inexpensive, and they significantly reduce the chances that a criminal can find any useful personal information in the trash. Banks typically recommend shredding documents that contain account information, Social Security numbers, credit-card and ATM receipts and credit-card offers. Also, shred blank checks that sometimes come in the mail as part of a solicitation.

Another suggestion: Be particularly aware if credit-card bills or bank statements are missing from the mailbox. If a bill arrives more than two weeks late, the American Bankers Association suggests contacting the local post office to be sure it isn't being forwarded without the recipient's knowledge. Also check with the company where the bill originated.

It's also wise to avoid disclosing any personal information on forms or applications unless absolutely necessary, says Mike Cunningham, senior vice president in the credit-card fraud department at J.P. Morgan Chase &amp; Co.

As an example, Mr. Cunningham says, he was recently filling out an application to be a coach on his son's neighborhood football team in Arizona, and the form asked for his social security number, driver's license number and other personal information. He declined to provide the information, because there was no way for him to know whether his personal information would be kept under lock and key.

"I just told the team mom that I didn't see why they needed it -- it was the perfect amount of information for an identity thief," he said. He got the job anyway.

The only organizations you're required to provide with your social security number are your employer and your financial institutions. (This is for tax purposes.) If anyone else asks -- say, a retailer -- you don't have to give it. The company can decline to provide the service, but it's worth asking what other identification they might accept instead.

Amid the proliferation of old-fashioned fraud, some financial institutions are fighting back by urging their customers to abandon paper statements altogether and instead view their accounts online. Among them is E.Trade Financial Corp., which says its online system is more secure than paper statements that can be stolen or copied. A spokeswoman declined to specify how much money the company will save by eliminating the printing and mailing of paper statements.

Banks are having a particularly tough time battling one of the oldest and most common kinds of crime: check fraud. Attempts of check fraud rose to $5.5 billion in 2003 from $4.3 billion in 2001, according to the American Bankers Association. The incidents resulted in losses of $677 million, representing a slight decline from $698 million in 2001; the trade group attributed the drop to better fraud-detection methods.

That slight decline isn't so reassuring to Lee Roberts, senior vice president at National Penn Bancshares Inc., a regional bank based in Boyertown, Pa. As recently as the past few weeks, the bank has been hit by a wave of incidents in which criminals have copied checks and then altered them for fraudulent use. That practice "has been around for seven or eight years," says Mr. Roberts. But as photocopiers and image-manipulation computer software become more sophisticated, he says, "they're getting better at it."

------

## Battling Identity Theft

Despite all the buzz about high-tech online identity theft, most instances revolve around old-fashioned fraud such as forging a signature on a check. Here are steps for reducing the risk:

▣ Check up on yourself regularly

Get a copy of your credit report every year from each of the major credit bureaus (TransUnion, Equifax, Experian) to make sure the records are accurate. Also, closely review all monthly bank and billing statements for discrepancies.

▣ Travel light

Avoid carrying around credit-card or personal documents unless you really need them.

▣ Keep personal data under wraps

Don't share personal ID numbers or passwords with anyone. Don't provide information over the phone or hand over personal data unless you know why it is needed. Keep a list of all account numbers in a secure place so that you have quick access if cards or documents get stolen or lost.

■ Buy a shredder for the home

Tear up or shred all credit-card receipts and all new-card offers that arrive in mail. Also destroy all documents that contain account numbers or other personal financial information.

■ Check the mail

Don't let mail sit in the mailbox for days on end. And don't place sensitive outgoing mail, such as bills, in your home mailbox to await collection. Instead, drop it in a collection box. Sources: Federal Trade Commission, American Bankers Association

First published on October 10, 2005 at 12:00 am

# EXHIBIT 4



Contact

Wednesday 12. September 2007
ies Cost £130 Million Daily   + + +   Ad: FORGET Filesharing like eDonkey or BitTorrent! Download uncensored Pictures, Softwar



**America's Payment Systems**
**Retriever Payment S**

About
News
Quotes
Clients
Resources
Careers
Services
F.A.Q.
Privacy Policy

Reliability

How long have
we done this?
Top
Home
Contact
Whats best for
your business

What can we do
for your
business?

Industry News

**Visa USA *Announces Account Truncation Initiative to
Protect Consumers from ID Theft***
**Visa CEO Announces New Initiative at Press
Conference with Sen. Dianne Feinstein**

**Washington, DC, March 6, 2003**



At a press conference today on Capitol Hill with Senators
Dianne Feinstein (D-CA), Judd Gregg (R-NH), Jon
Corzine (D-NJ) and Patrick Leahy (D-VT), Visa USA
CEO Carl Pascarella, announced Visa USA's new
account truncation program to protect consumers from
identity theft. The following are excerpts of Mr.
Pascarella's remarks:

"I am here today to talk about the steps that Visa is
taking to put identity theft protections in place. Visa USA
and our Member financial institutions have a long history
of using state of the art technology to further protect
cardholder information. Visa was the first payments
company to adopt a zero liability policy for unauthorized
purchases, and we've continued this leadership role with
Verified by Visa, which authenticates cardholders for
Internet purchases, and our sophisticated neural networks
that monitor spending anomalies.

"We have also implemented our Cardholder Information
Security Program, or CISP, a set of 12 requirements for
protecting cardholder data for which all Visa payment
system participants need to comply. In fact, Visa is
adding more resources to our auditing process to ensure
any entity that touches a Visa transaction will be
compliant with our Cardholder Information Security

Program rules. The CISP "Digital Dozen" was the first set of standards within the payments industry for protecting cardholder data and served as a best practices model by the G-8 conference on cyber-crime in Tokyo.

"Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. This is an added security measure for consumers that doesn't require any action by the cardholder. We are proud to be the first payments brand to announce such a move to protect cardholders' identities by restricting access to their account information on receipts.

" The first phase of this new policy goes into effect July 1, 2003 for all new terminals. I would like to add, however, that even before this policy goes into effect, many merchants have already voluntarily begun truncating receipts, thanks to groundwork that we began together several years ago.

" Receipt truncation is good news for consumers, and bad news for identity thieves. Identity thieves thrive on discarded receipts and documents containing consumers' information such as payment account numbers, addresses, Social Security numbers, and more. Visa's new policy will protect consumers by limiting the information these thieves can access.

" Visa's new receipt truncation measure builds upon our other security measures I mentioned, zero liability cardholder protection, Verified by Visa, neural networks and the Cardholder Information Security Program.

" Our receipt truncation policy is the latest initiative in Visa's broader identity theft consumer protection effort. I can't go into the details at the moment, but we will be announcing a series of additional steps to combat identity theft and offer tools to consumers.

" Visa is focused on maintaining the trust we have earned

through our security leadership. Because there is no silver bullet to eliminate identity theft, we are constantly adding new layers of security to protect cardholders. As a result of these, and many other security measures, fraud within the Visa system has fallen to an all-time low of just 7 cents per $100 transacted.

" Visa U.S.A. is pleased to be working with Senator Feinstein, and the other senators here today in the fight to protect consumers from identity theft. We look forward to continuing our joint efforts; after all, we share the same goals."

©Copyright 2004 RPS America All Rights Reserved
For more information feel free to Contact Us

# EXHIBIT 5



# Rules for Visa Merchants
Card Acceptance and Chargeback
Management Guidelines





# Transaction Receipt Requirements—Card-Present Merchants

The following are Visa requirements for all transaction receipts generated from electronic point-of-sale terminals (including cardholder-activated terminals).

## Electronic Point-of-sale Terminal Receipts

**Merchant or member name and location, or the city and state of the Automated Dispensing Machine or Self-Service Terminal**

**Transaction Date**

**Merchant Location Code**

*Effective November 1, 2005, the payment brand used to complete the transaction must be identified on the cardholder's copy of the transaction receipt.*

**Authorization Code, if applicable**, *except for Express Payment Service Transactions.*

**Space for Cardholder Signature**, *except for:*
- *Transactions in which the PIN is an acceptable substitute for Cardholder signature*
- *Limited-Amount Terminal Transactions*
- *Self-Service Terminal Transactions*
- *Express Payment Service Transactions*



```
        XYZ SHOES
       1040 PARK ST
     ANYTOWN, CA 94501
   PHONE # (000)555-5555
   NOV 10, 2005    12:30PM

    MERCH ID:   08233004

REF  # : 003
ACT  # : ************5220
EXP    : XX/XX
CARD   : VISA
                      $21.69

APPROVAL CODE:     035789
TRAN ID: VGT7ET800815

   I AGREE TO PAY ABOVE
  TOTAL AMOUNT ACCORDING
  TO CARD ISSUER AGREEMENT

X
       SIGNATURE

      THANK YOU
    CARDHOLDER COPY
```

**Truncated Account Number**
*Visa requires that all new electronic POS terminals provide account number truncation on transaction receipts. This means that only the last four digits of an account number should be printed on the customer's copy of the receipt.*

*In addition, the expiration date should not appear at all. Existing POS terminals must comply with these requirements by July 1, 2006. To ensure your POS terminals are properly set up for account number truncation, contact your merchant bank.*

**Transaction Amount**

©2006 Visa U.S.A. Inc., all rights reserved, to be used solely for the purpose of providing Visa Card acceptance services as authorized pursuant to agreement with a Visa member financial institution

# EXHIBIT 6

## DECLARATION OF KEITH J. KEOGH

Keith J. Keogh declares under penalty of perjury, as provided for by §1-109 of the Illinois Code of Civil Procedure, that the following statements are true:

The Law Offices of Keith J. Keogh, Ltd. consists of two attorneys and a paralegal as well as receptionists. The firm focuses on consumer protection cases for both individuals and class actions.

I am a partner of the firm and member of United States Court of Appeals for the Seventh Circuit, Northern District of Illinois, Southern District of Indiana, and Illinois State Bar as well as several bar associations and the National Association of Consumer Advocates and Association of Trial Lawyers of America.

I was lead counsel in the following class settlements: *Overlord Enterprises v. Wheaton Winfield Dental Associates*, 04 CH 01613, Circuit Court Cook County (Judge McGann)(Final Approval Pending); *Whiting v SunGard*, 03 CH 21135, Circuit Court Cook County (Judge McGann); *Whiting v. GoIndustry*,03 CH 21136, Circuit Court Cook County (Judge McGann). I was the attorney primarily responsible for the following class settlements: *Wollert v. Client Services*, 2000 U.S. Dist. LEXIS 6485 (N.D. Ill. 2000); *Rentas v. Vacation Break USA*, 98 CH 2782, Circuit Court of Cook County (Judge Billik); *McDonald v. Washington Mutual Bank*, supra; *Wright v. Bank One Credit Corp.*, 99 C 7124 (N.D. Ill. Judge Guzman); *Arriaga v. Columbia Mortgage*, 01 C 2509 (N.D. Ill. Judge Lindberg); *Frazier v. Provident Mortgage*, 00 C 5464 (N.D. Ill. Judge Coar); *Largosa v. Universal Lenders*, 99 C 5049 (N.D. Ill. Judge Leinenweber); *Arriaga v. GN Mortgage*, (N.D. Ill. Judge Holderman); *Williams v. Mercantile Mortgage*, 00 C 6441 (N.D. Ill. Judge Pallmeyer); *Reid v. First American Title*, 00 C 4000 (N.D. Ill. Magistrate Judge Ashman); *Fabricant*

*v. Old Kent*, 99 C 6846 (N.D. Ill. Magistrate Judge Bobrick); *Mendelovits v. Sears*, 99 C 4730 (N.D. Ill. Magistrate Judge Brown); *Leon v. Washington Mutual*, 01 C 1645 (N.D. Ill. Judge Alesia).

The individual class member's recovery in some of these settlements were substantial. For example, in one of the cases against a major bank the class members' recovery was 100% of their actual damages resulting in a payout of $1,000 to $9,000 per class member. In another case against a major lender regarding mortgage servicing responses, each class member who submitted a claim form received $1,431. *McDonald v. Washington Mutual Bank*

Some reported cases of mine involving consumer protection cases include: *Echevarria et al. v. Chicago Title and Trust Co.*, 256 F.3d 623 (7th Cir. 2001); *Hill v. St. Paul Bank*, 329 Ill. App. 3d 705 (1st Dist. 2002); *Cook v. River Oaks Hyundai, Inc.*, 2006 U.S. Dist. LEXIS 21646 (N. D. Ill. 2006); *Gonzalez v. W. Suburban Imps.*, Inc., 411 F. Supp. 2d 970 (N.D. Ill. 2006); *Eromon v. Grand Auto Sales, Inc.*, 333 F. Supp. 2d 702 (N.D. Ill. 2004); *Williams v. Precision Recovery, Inc.*, 2004 U.S. Dist. LEXIS 6190 (N.D. Ill. 2004); *Doe v. Templeton*, 2003 U.S. Dist. LEXIS 24471 (N.D. Ill. 2003); *Ayala v. Sonnenschein Fin. Servs.*, 2003 U.S. Dist. LEXIS 20148 (N.D. Ill. 2003); *Gallegos v. Rizza Chevrolet, Inc.*, 2003 U.S. Dist. LEXIS 18060 (N.D. Ill. 2003); *Szwebel v. Pap's Auto Sales, Inc.*, 2003 U.S. Dist. LEXIS 13044 (N.D. Ill. 2003); *Johnstone v. Bank of America*, 173 F. Supp.2d 809 (N.D. Ill. 2001); *Leon v. Washington Mutual Bank*, 164 F. Supp.2d 1034 (N.D. Ill. 2001); *Ploog v. HomeSide Lending*, 2001 WL 987889 (N.D. Ill. 2001); *Christakos v. Intercounty Title*, 196 F.R.D. 496 (N.D. Ill. 2000); *Batten v. Bank One*, 2000 WL 1364408 (N.D. Ill. 2000); *McDonald v. Washington Mutual Bank*, 2000 WL 875416 (N.D. Ill. 2000); and *Williamson v. Advanta Mtge Corp.*, 1999 U.S. Dist. LEXIS 16374 (N.D. Ill. 1999). The *Christakos* case significantly broadened title and mortgage companies' liability under Real Estate Settlement Procedures Act ("RESPA") and *McDonald* is the first reported decision to certify a class regarding

mortgage servicing issues under the Cranston-Gonzales Amendment of RESPA.

I have argued before the Seventh Circuit, the First District of Illinois and the Multi-Litigation Panel in *Sawyer v Esurance* (Ruling Pending) , *Echevarria, et al. v. Chicago Title and Trust Co.*, *Hill v. St. Paul Bank*, and *In Re: Sears, Roebuck & Company Debt Redemption Agreements Litigation*, MDL Docket No. 1389.

*Echevaria* was part of a group of several cases that resulted in a nine million dollar settlement with Chicago Title.

My published works include co-authoring and co-editing the 1997 supplement to *Lane's Goldstein Trial Practice Guide* and *Lane's Medical Litigation Guide*.

In January 2007, Alexander H. Burke joined the firm. Mr. Burke previously worked for a consumer class action firm, and has devoted his legal career to protection of consumers' rights. Notable court opinions from cases that he litigated include: *Barnes v. FleetBoston Fin. Corp.*, C.A. No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D.Mass. Aug. 22, 2006) (appeal bond required for potentially frivolous objection to large class action settlement); *Longo v. Law Offices of Gerald E. Moore & Assocs., P.C.*, 04 C 5759, 2006 U.S. Dist. LEXIS 19624 (N.D.Ill. March 30, 2006) (class certification granted); *Nichols v. Northland Groups, Inc.*, case nos. 05 C 2701, 05 C 5523, 06 C 43, 2006 U.S. Dist. LEXIS 15037 (N.D.Ill. March 31, 2006) (class certification granted for concurrent classes against same defendant for ongoing violations); *Lucas v. GC Services, L.P.*, case No. 2:03 cv 498, 226 F.R.D. 328 (N.D.Ind. 2004) (compelling discovery), 226 F.R.D. 337 (N.D.Ind. 2005) (granting class certification); *Murry v. America's Mortg. Banc, Inc.*, case nos. 03 C 5811, 03 C 6186, 2006 U.S. Dist. LEXIS 42900 (N.D. Ill. June 5, 2006) (granting class certification); *Rawson v. Credigy Receivables, Inc.*, case no. 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. Feb. 16, 2006) (denying motion to dismiss in case against debt collector for suing on time-barred debts); *In re*

*Kingen*, no. 01-84275, adv. No. 03-8020, 2004 Bankr. LEXIS 146 (Bankr.C. D. Ill. Feb. 17, 2004) (extending bankruptcy law in favor of debtor).

Mr. Burke graduated from Colgate University in 1997 (B.A. International Relations), and Loyola University Chicago School of Law in 2003 (J.D.).

During law school he served as an extern to the Honorable Robert W. Gettleman of the District Court for the Northern District of Illinois and as a law clerk for the Honorable Nancy Jo Arnold, Chancery Division, Circuit Court of Cook County. He also served as an extern for the United States Attorney for the Northern District of Illinois and was the Feature Articles Editor of the Loyola Consumer Law Review and Executive Editor of the International Law Forum. Mr. Burke's published work includes *International Harvesting on the Internet: A Consumer's Perspective on 2001 Proposed Legislation Restricting the Use of Cookies and Information Sharing*, 14 Loy. Consumer L. Rev. 125 (2002).

Mr. Burke is licensed to practice law in the State of Illinois and is a member of the bar of the United States Court of Appeals for the Seventh and First Circuits, as well as the Northern District of Illinois, Central District of Illinois, Southern District of Illinois, Eastern District of Wisconsin, Northern District of Indiana and Southern District of Indiana. Mr. Burke is also an active member of the Chicago Bar Association, Illinois Bar Association and the National Association of Consumer Advocates.

Executed at Chicago, Illinois, on September 12, 2007

Keith J. Keogh